**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**


GREENBRIER HOTEL CORPORATION, et al.,

                    Plaintiffs,

v.                                      CIVIL ACTION NO.   5:13-cv-11644

UNITE HERE HEALTH, et al.,

                    Defendants.


**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendants' Motion for Summary Judgment* (Document 134) and *Memorandum in Support* (Document 136), the *Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment* (Document 146), and the Defendants' *Reply in Support of Defendants' Motion for Summary Judgment* (Document 147), as well as all exhibits attached in support.   The Court has also reviewed the *Plaintiffs' Motion for Summary Judgment* (Document 137) and *Memorandum of Law in Support* (Document 138), the *Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment* (Document 145), and the Plaintiffs' *Reply in Support of Plaintiffs' Motion for Summary Judgment* (Document 149), as well as all exhibits attached in support.   For the reasons stated herein, the Court finds that the Defendants' motion should be denied, and the Plaintiffs' motion should be granted in part and denied in part.

**FACTUAL AND PROCEDURAL HISTORY**

The factual and procedural history is laid out in great detail in the Court's December 19, 2013 *Memorandum Opinion and Order* (Document 35) granting in part and denying in part the

Defendants' motion to dismiss.   To promote clarity and ease of reference, however, the Court

provides the following summary of the (i) remaining counts, (ii) relevant facts, and (iii) procedural

history.

 *A. Remaining Counts*

 The Court's December 19, 2013 Opinion dismissed all of the Plaintiffs' causes of action

except Counts I and II, alleging that the Defendants breached fiduciary duties owed to the Plan

Participants (Count I) and The Greenbrier (Count II).

 In support, the Plaintiffs allege that the Defendants have:

> (a) engaged in a course of action to throw The Greenbrier out of the Fund and terminate the benefits of The Greenbrier's employees (and their dependents), participants and beneficiaries of Plan Unit 155, by terminating Plan Unit 155 and diverting the excess assets of Plan Unit 155 for unlawful purposes;

> (b) withheld and/or diverted Plan Unit 155 assets within the Fund, which resulted from prior contributions by The Greenbrier (with internal contributions from its employees of 20%), in violation of the requirement that the assets be held for the exclusive purpose of providing benefits to the participants and beneficiaries of Plan Unit 155;

> (c) failed and refused to use the excess assets from Plan Unit 155 for the beneficial use of its participants and beneficiaries;

> (d) failed and refused to transfer the excess assets of Plan Unit 155, for the benefit of Plan Unit 155 participants and beneficiaries, to the New Greenbrier Trust for the purposes of paying claims under the New Greenbrier Plan;

> (e) acted contrary to and in violation of the operative and governing documents for Plan Unit 155;

> (f) unlawfully amended or attempted to amend the operative and governing documents for Plan Unit 155 in an effort to utilize and divert assets of Plan Unit 155 to pay claims arising under other employee welfare benefit plans under the aegis of the Fund (and

thereby benefiting individuals in other welfare benefit plans who are members of UNITE HERE and employed by other employers in the Fund); and

(g) failed to reduce or eliminate required contributions from The Greenbrier (and its employees) for Plan Unit 155 after deciding that they were going to throw The Greenbrier out of the Fund and terminate Plan Unit 155 effective January 31, 2013, thereby continuing to increase the already unnecessary accumulation of excess assets they intended to improperly and unlawfully retain from Plan Unit 155 upon its termination.

(Document 1 at 19-20.)   The Plaintiffs further contend that "[e]ach of the actions set forth above violates ERISA's (the Employee Retirement Income Security Act) statutory duties for fiduciaries" and were "done in bad faith, were arbitrary and capricious, constitute an abuse of the Defendants' discretion, were discriminatory and directly violated the express terms of the various Plan Unit 155 documents heretofore adopted by the Trustees."   (*Id.* at 21.)

### B. Factual History

Defendant UNITE HERE established a multi-employer trust, UNITE HERE HEALTH (the Fund), to provide health and welfare benefits to various employees of participating employers. The Fund is comprised of more than twenty (20) separate "Plan Units" that were implemented to offer different levels of benefits to participants and their dependents depending on the region and industry.   The Plan Unit for The Greenbrier and its employees is Plan Unit 155.   The Greenbrier contributed eighty (80%) percent of the total contributions, while the employees contributed the remaining twenty (20%) percent.

At the outset, the Court notes that the parties dispute many aspects of this case.   The first dispute concerns the classification of the Plaintiffs' contributions to Plan Unit 155, and more importantly, whether Plan Unit 155 is a separate and distinct ERISA plan.   It is undisputed that

the Fund issues a single Summary Annual Report (SAR).   (Document 136 at 5) (citing Ex. 8.)
However, the Plaintiffs argue that their contributions to the Plan were separate and distinct, and if
not, are readily discernible from the other employer contributions that comprise the Fund.   The
Defendants stress that the contributions were not separate, but instead immediately pooled with
contributions from all of the other employers participating in the Fund.   In sum, the Plaintiffs
contend that Plan Unit 155 was a separate ERISA plan within the Fund, while the Defendants
maintain that the Fund—comprised of twenty Plan Units—is one single ERISA plan.

A second factual dispute concerns the respective Plan Documents of the Fund and Plan
Unit 155, and each party's respective rights and duties.   This disagreement includes whether the
Trustees breached their fiduciary duties owed to the Plaintiffs when certain plan documents were
amended.   The parties further dispute what standard of review the Court is to apply to the fiduciary
decisions.   The Plaintiffs argue for *de novo* review, and the Defendants claim that abuse of
discretion is the appropriate standard.   Further still, the parties dispute whether the relevant
documents are ambiguous or not, and if so, what extrinsic evidence is relevant.

It is undisputed that "The Greenbrier and the Fund entered into a written contract, [the]
'Participation Agreement,' wherein the parties agreed that the Greenbrier and its employees would
participate in the Fund and the Fund would administer the benefit plan."   (Document 138 at 3)
(citing Ex. 2.)   The Participation Agreement provided that "The Greenbrier will be underwritten
as an independent plan unit with the Welfare Fund," and "[o]nly the claims utilization of The
Greenbrier Plan, including Local 863, will be used in calculating future rates for The Greenbrier."
(*Id.*)

4

In turn, the Participation Agreement mandated that the Fund and Plan Unit 155 were governed "by the Sixth Amended and Restated Agreement and Declaration of Trust Governing the Hotel Employees and Restaurant Employees International Union Welfare Fund" (Sixth Amended Trust Agreement).  (*Id.*; *see also* Document 136 at 2.)  "The Trust Agreement names a joint labor/management board of trustees as the Fund's fiduciary (the Trustees), and allows the Trustees to delegate certain duties," while also permitting them to "'[a]dopt rules and regulations for the administration of the Welfare Fund and Welfare Plan . . ..'"  (Document 136 at 2) (internal citation omitted.)  The Trust Agreement also dictates that the Trustees have "'full and exclusive jurisdiction and discretionary authority to decide all questions or controversies of whatever character arising in any manner between any parties or persons in connection with the Welfare Fund or interpretation thereof . . .,'" as well as to "'establish a funding policy and funding method . . . [and] to establish the rates at which Employers are required to contribute to the Welfare Fund.'" (*Id.*)  The Greenbrier agreed to be bound by the Trust Agreement and Minimum Standards of the Welfare Fund.  (*Id.*)

Importantly, the Trustees adopted certain Plan Documents, including the 2004 Rules and Regulations (2004 Rules) and 2004 Summary Plan Description (2004 SPD).  (Document 138 at 1-2.)

The 2004 Rules, in relevant part, stipulated:

> If it should happen that the Plan is terminated, benefits for a Covered Expense incurred before the termination date fixed by the Trustees will be paid as long as the Plan's assets are more than the Plan's liabilities.  Full benefits may not be paid if the Plan's liabilities are more than its assets.  If there are any excess assets remaining after the payment of all Plan liabilities, those excess assets will be used for purposes consistent with the purpose of the Plan as determined

> by the Trustees, or they may be transferred to another employee
> benefit fund providing similar benefits.

(Document 138 at 4) (emphasis in original) (citing Ex. 4, p.130, Art. 19 § 12.)

Similarly, the 2004 SPD stated in pertinent part:

> If the Plan is terminated, benefits for claims incurred before the
> termination date will be paid based on available assets.   Full
> benefits may not be available if the Plan owes more than it has
> money to pay.   If there is money left over, the Trustees may use it
> in a manner consistent with the purposes for which the Plan was
> created or they may transfer it to another fund providing similar
> benefits.

(Document 138 at 5) (emphasis in original) (citing Ex. 6, p. 68.)

A new Collective Bargaining Agreement (CBA) was executed in 2009, and the Trustees

adopted the 2009 Rules and Regulations (2009 Rules) and a new Summary Plan Description (2009

SPD).   (Document 138 at 5.)   "On October 6, 2010, the Fund sent a letter to the employees of the

Greenbrier who were participants and advised them that they could no longer receive benefits from

the Fund after January 31, 2013 due to [] the Greenbrier employees' decision to disaffiliate with

UNITE HERE International Union."   (Document 138 at 6) (citing Ex. 11.)   "The Fund offered to

allow The Greenbrier to remain in the Fund for an additional six months beyond [January 31,

2013] . . . but The Greenbrier did not accept that offer."   (Document 136 at 5) (citing Ex. 16.)

Thereafter, on October 18, 2012, a Seventh Amended Trust was adopted, replacing the

Sixth Amended Trust.   The Seventh Amended Trust deleted the following sentence that originally

appeared in the Sixth Amended Trust: "The trustees and the Fund Executives, as fiduciaries of the

Fund, shall be fiduciaries at all times and for all activities, including when carrying out traditional

settlor functions."   (*Id.* at 7) (citing Ex. 12, pp. 7-8, § 3.)

6

On November 30, 2012,[1] the Chief Financial Officer (CFO) of the Greenbrier wrote to the Fund's in-house counsel requesting "an accounting" and "the amount of any excess assets over liabilities in said Plan as of the date of accounting."   (Document 138 at 7) (citing Ex. 14.)   On November 30, 2012, a Benefit Plan Resolution to the 2009 Rules and Regulations was promulgated among the Trustees, reflecting that:

> If there is any excess assets remaining after the payment of all plan liabilities, those excess assets will be used for purposes consistent with the purposes of the Trust Agreement as determined by the Trustees, including the transfer of such excess assets to another Plan providing similar benefits.

(Document 138 at 7) (emphasis in original) (citing Ex. 15.)   The Trustees adopted the resolution by mail ballot on December 7, 2012, resulting in the 2011 Rules.   (*See* Document 136, Ex. 16.) The 2009 SPD was never amended (*id.*), and contains the following language: "The [Fund] was created to provide benefits for you and your covered dependents.   The Fund serves participants working for employers in the hospitality industry . . . Your Plan, Plan Unit 155, has been adopted by the Trustees for the payment of . . . benefits from the Welfare Fund."   (Document 145 at 11) (citing Ex. 5 at UHH794.)   It is undisputed that the SPD stated that the Rules controlled any dispute between the two documents, and the Rules in turn stipulated that they are subject to the Trust agreement.

"Because The Greenbrier's employees made up nearly all of the employees covered by Plan Unit 155, the Trustees decided to terminate Plan Unit 155" around January 31, 2013. (Document 136 at 4) (citing Ex. 17 at UHH3467-70.)   The Greenbrier negotiated a new employer-funded health plan with its employees' unions, and established the Greenbrier Union Health and

---

[1]   The record reveals that while the letter was "dated November 30, 2012, it was not faxed to the Fund until December 3, 2012."   (Document 145 at 16.)   The Plaintiffs did not refute this contention.

Welfare Plan.   On May 10, 2013, "James Miller, on behalf of the Greenbrier and its union employees, forwarded a letter demanding the transfer of the excess assets to the Trust of the Greenbrier Union Health and Welfare Plan . . .."   (Document 138 at 8.)

     *C. Procedural History*

     Approximately one week later, on May 17, 2013, the Greenbrier initiated this lawsuit by filing the *Complaint* (Document 1).   The *Defendants' Motion for Summary Judgment* and *Defendants' Memorandum in Support of their Motion for Summary Judgment* were filed on June 1, 2015, *Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment* was filed on June 15, 2015, and Defendants' *Reply in Support of Defendants' Motion for Summary Judgment* was filed on June 25, 2015.   The *Plaintiffs' Motion for Summary Judgment* and *Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment* were filed on June 1, 2015, *Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment* was filed on June 15, 2015, and the Plaintiffs' *Reply in Support of Plaintiffs' Motion for Summary Judgment* was filed on June 25, 2015.

     On June 25, 2015, *Defendants' Motion to Strike (or Disregard) Plaintiffs' Expert Declaration* (Document 148) was filed, Plaintiffs' *Response in Opposition to Defendants' Motion to Strike (or Disregard) Plaintiffs' Expert Declaration* (Document 150) was filed on July 13, 2015, and *Defendants' Reply in Support of Motion to Strike (or Disregard)* (Document 153) was filed on July 23, 2015.   These matters are ripe for ruling.

## STANDARD OF REVIEW

     The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of

credibility.  *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986).   If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250.   If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review.  *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd,* 474 F. App'x 101 (4th Cir. 2012).   Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## DISCUSSION

The Defendants[2] first contend that the Plaintiffs do not enjoy standing to sue for any purported ERISA violations because The Greenbrier was never a fiduciary, and even if it were,

---

2   The Court begins with the Defendant's motion for summary judgment, but includes and delineates the parties' argument pertaining to the Plaintiffs' motion for summary judgment, as well, in light of the fact that the arguments in both sets of briefing largely mirror each other.   The Court has separately considered each party's argument against the applicable summary judgment standard.

this status "indisputably ended when The Greenbrier withdrew from the Fund on January 31, 2013"
as "it owed no more money to the Fund and did not have to pay any more contributions."
(Document 136 at 11; Document 145 at 7-8.)  Additionally, the Defendants argue that even if The
Greenbrier were still a fiduciary after it withdrew from the Fund, "its claims would fail because it
seeks recovery for a separate welfare plan, not for the Fund or Fund participants."  (*Id.*) (citing
*Sonoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366 (4th Cir. 2003)).

Regarding the other Plaintiffs, the Defendants argue that while they were once participants
of the Fund, this status ceased after January 31, 2013, and they point the Court to ERISA statutory
language defining "participant" as one who is "or may become eligible to receive a benefit of any
type . . .."  (*Id.* at 12) (citing 29 U.S.C. § 1002(7) (*See also* Document 145 at 7.)  The Defendants
also note that "[a] person 'may become eligible to receive a benefit' if he has a 'colorable claim'
that he 'will prevail in a suit for benefits' or that 'eligibility requirements will be fulfilled in the
future.'"  (Document 136 at 12) (internal citations omitted.)  The Defendants argue that "[u]nder
the Trust, a person stops being a Fund participant when its employer's obligation to remit
contributions to the Fund ends," and because the Greenbrier remitted no contributions after
January 31, 2013, all Plaintiffs' participation in the Fund ended.  (*Id.*; Document 145 at 7.)

With respect to the Plaintiffs' allegations of breach of fiduciary duties, the Defendants
argue that the Fund did not kick out the Greenbrier because "the Greenbrier and its employees'
unions negotiated a new contract [in 2012] that did not seek continued coverage under the Fund
and declined an offer to continue coverage for six months beyond January 31, 2013."  (Document
136 at 13; Document 145 at 19-20.)  The Defendants argue that even if they terminated the
Greenbrier's participation, "such a termination would have been consistent with the governing

plan documents and in accord with the functioning of multi-employer plans" because "[t]he non-renewal of The Greenbrier's participation in the Fund was a term of the July 2010 settlement agreement between UNITE HERE and the SEUI (the collective bargaining representative for the Greenbrier employees)" which mandated that "any bargaining unit that disaffiliated with UNITE HERE (i.e. The Greenbrier) could only remain in the Fund until the expiration of the current collective bargaining agreement."   (Document 136 at 13, n. 7; Document 145 at 8-12.)

The Defendants stress that no fiduciary duties were breached when they refused the request to transfer excess assets because "nothing in any governing plan document required a transfer of assets to The Greenbrier or its new trust when it left the Fund," noting that once tendered, contributions "instantly became Fund assets" to promote the central benefit of a multi-employer plan: risk pooling.   (Document 136 at 14; Document 145 at 9-11.)   The Defendants assert that "it is not a breach of fiduciary duty to follow the express and lawful terms of a plan," and argue that "[u]sing Fund assets to offset The Greenbrier's current benefit costs (even if through The New Greenbrier Trust), would effectively use Fund assets for benefit of The Greenbrier and non-participants," something ERISA rules prohibit.   (Document 136 at 14-15; Document 145 at 12-14.)

The Defendants contend that abuse of discretion is the appropriate standard when reviewing the Trustees' decisions, arguing that under this standard, 'a reviewing court [will] not disturb an administrator's decision if it is reasonable, even if th[e] Court would have reached a different conclusion."   (Document 136 at 15) (citing *Feder v,. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000)) (*See also* Document 145 at 17-18.)   They also argue that the plan language is "unambiguous," and thus, the Court must only look to the "four corners of the plan,

12

and only look to extrinsic evidence when the plan language is ambiguous." (Document 136 at 15; Document 145 at 15-17.) The Defendants refute the Plaintiffs' claim that the Plan Rules require a transfer of excess assets, noting that "[t]he referenced language does not mandate a transfer of assets—it leaves the disposition of those assets entirely (and appropriately) up to the Trustees." (Document 136 at 16.) They argue that the Plan Rules "must be read in concert with the Trust's purpose and anti-inurement provisions, which are easily harmonized" because "any assets left over after a Plan Unit is terminated are Trust assets and will be used to fund benefits for participants in all of the remaining Plan Units," and a contrary result "would defeat the risk pooling that underlies a multi-employer fund . . .." (*Id.* at 16-17.)

The Defendants note that no language in the applicable documents "**mandates** that such assets be transferred from the Fund to this other plan," but instead, at most, "provides that such a transfer is permissible (i.e. a choice)," and "[w]here a plan provides a fiduciary with two choices, selection of either choice cannot constitute an abuse of discretion." (*Id.* at 17) (emphasis in original.) They argue that "amending the Plan Unit 155 Rules or other operative documents" were "core settlor functions of the Trustees," negating any liability for "ERISA breach of fiduciary duty . . .." (*Id.* at 17-18.) The Defendants also maintain that even if ambiguous, all of the extrinsic evidence "supports the Fund" and the decision to not transfer assets because (i) they have "**never** remitted 'excess assets' to a disaffiliating employer," (ii) The Greenbrier's advisors "told it that it was not due any surplus from the Fund," (iii) and "The Greenbrier acknowledged that it was entitled to no surplus from the Fund" when it failed to "treat these surpluses as its own assets" in "its 2009 bankruptcy." (*Id.* at 18-19) (emphasis in original) (*See also* Document 145 at 16-17.)

Finally, they stress that Plan Unit 155 cannot be a proper Defendant because it was (i) "never a separate ERISA plan," (ii) "[a]ny claim of fiduciary status is negated as the Trust Agreement grants no fiduciary authority to Plan Unit 155, and no facts show that it possessed such authority," and (iii) "[e]ven if Plan unit 155 was a separate plan, any fiduciary duty owed to its participants ended when it was terminated in January 2013."   (Document 136 at 19-20; Document 145 at 2-5.)

The Plaintiffs respond in opposition that "[t]here is no question the Participant Plaintiffs have standing under ERISA," but if the Court should disagree and hold that the Greenbrier is not a fiduciary "at the present time," then "the Greenbrier is a necessary party under Fed. R. Civ. P. 19 for the participant Plaintiffs to obtain complete relief."   (Document 146 at 6.)   The Plaintiffs also dispute the notion that they lack standing simply because Plan Unit 155 is terminated, and cite *Wilmington Shipping Co. v. New Eng. Life Ins. Co.*, 496 F.3d 326 (4th Cir. 2007) for support. (Document 146 at 7; Document 138 at 9; Document 149 at 9.)   They argue that the "important question is whether the participant Plaintiffs claim entitlement under the terms of the plan itself," and "[t]his the participant Plaintiffs clearly do."   (Document 146 at 8.)

The Plaintiffs argue that the Greenbrier is a fiduciary "because it had control over contributions to the Fund" that were "plan assets in the hands of the Greenbrier."   (*Id.* at 9-10; Document 149 at 10.)   The Plaintiffs further contend that "the Greenbrier has a continuing fiduciary duty to monitor the Fund's Trustees that arose when it originally agreed to be bound by the trust agreement," and claim "the Greenbrier effectively appointed the Employer trustees when it agreed to be bound by the trust agreement" even "[]though the Seventh Amended Trust Agreement provides a procedure for removal and appointment of Trustees . . .."   (Document 146

14

at 10; Document 149 at 10.)   Succinctly, "the Greenbrier [brings] suit based on its fiduciary duty to monitor," and argues that the Defendants' "reliance on [*Sonoco*] is misplaced."   (Document 146 at 10-11.)

The Plaintiffs maintain it is "a disputed issue of fact" whether they were kicked out of the Fund, but argue that the settlement agreement between SEIU and UNITE HERE did not apply to The Greenbrier because "the unit was to be retained rather than transferred."   (*Id.* at 12) (internal citation omitted) (Document 138 at 14.)   They argue that the six month continued coverage was not accepted "because the notice made clear it would not be available" as they were advised about the continued coverage "just three months prior to the expiration of coverage."   (Document 146 at 12.)   The Plaintiffs aver that the "plain language" of the relevant documents require that excess assets be used for the benefit of Greenbrier employees, (*id.* at 13, 15-16; Documents 138 at 11-15, 149 at 11-15), and a transfer "would in no way turn ERISA rules upside down."   (Document 146 at 14) (internal citation omitted.)   They cite *Trapani v. Consolidated Edison Employees' Mut. Aid Soc., Inc.*, 891 F.2d 48 (2d Cir. 1989) for support, (*id.* at 15; Document 138 at 15-16; Document 149 at 14-15), and stress that a transfer of excess assets to the Greenbrier's New Fund "would [not] violate the anti-inurement provision of the Trust Agreement" because both the Plan Participants and the Greenbrier merely "seek return of monies contributed by them" to provide "health benefits for Greenbrier employees, including a temporary suspension or reduction of employee contributions."   (Document 146 at 14) (internal emphasis omitted) (*see also* Document 149 at 12-13.)

They also argue that the Trustees' decision should be subject to *de novo* review because they failed to act or exercise their discretion in the week between the letter demanding transfer of

15

assets and the filing of the complaint.   (Document 146 at 16-17; Document 138 at 10; Document 149 at 16-17.)   They complain there is no decision of the Trustees, and more importantly, no analysis underlining that decision to which the abuse of discretion standard can be applied. (Document 146 at 17; Document 149 at 16-17.)   The Plaintiffs posit that the Trustees' decision fails even under the multi-prong approach for abuse of discretion promulgated by the Fourth Circuit in *Helton v. AT&T, Inc.*, 709 F.3d 343 (4th Cir. 2013), focusing on the "eighth factor, which requires consideration of motives and conflicts."   (Document 146 at 17; Document 138 at 13-15; Document 149 at 18-19.)

They assert that the decision was a calculated effort to retain the excess assets, delivered with tainted motives and a conflict of interest.   (Document 146 at 17.)   They also assert that any ambiguity was "[c]reated by the Trustee's themselves by the discriminatory amendments made to the plan documents," and argue that the extrinsic evidence actually supports their position, including the Greenbrier CFO's belief that contributions would not be intermingled with the rest of the Fund.   (Document 146 at 18; Document 149 at 16.)   Further, the Plaintiffs assert that "[s]o long as the Fund retains those excess assets, Plan Unit 155 exists," and this result is consistent with *Wilmington Shipping*.   (Document 146 at 20; Document 149 at 9.)

The Defendants reply that standing is absent because the Plaintiffs "do not even sue for benefits" under Plan Unit 155, but instead "seek a transfer of Fund assets to support a wholly separate plan."   (Document 147 at 1; Document 145 at 6-7.)   They continue to argue that the Participant Plaintiffs' claim is foreclosed by "black letter law" because they were no longer Fund participants on May 17, 2013, when suit was filed.   (Document 147 at 2-3) ("Plaintiffs thus concede that they are not seeking to have the Fund pay claims under any schedule of benefits, but

16

rather to have future benefits paid under a wholly separate plan.   This admission underscores that Plaintiffs do not seek benefits and do not meet the 'participation' test set forth in *Firestone* [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989)].")

They maintain that the Greenbrier was not a fiduciary of the Fund, and the continuing duty to monitor the Fund's Trustees argument is contradicted by their interrogatory responses and "in the Fed. R. Civ. P. 30(b)(6) deposition" where it was never mentioned.   (Document 147 at 5; Document 145 at 7.)   The Defendants argue that Rule 37(d) of the Federal Rules of Civil Procedure bars this position, and even if not barred, "it still would fail as a matter of law" because "[a]ny appointment authority The Greenbrier had ceased on January 31, 2013."   (Document 147 at 5-7; Document 145 at 8.)   The Defendants posit that even if a fiduciary, the Greenbrier's arguments for transfer fail because "it seeks to benefit itself by offsetting the cost of a separate welfare plan; it does not seek to benefit the Fund or Fund participants."   (Document 147 at 7.)

The Defendants rebut the Rule 19 assertion, noting that the Greenbrier is not a necessary party because "its presence in this action has no bearing on the ability of the individual Plaintiffs to obtain complete relief," and any transfer "does not require that The Greenbrier be named as a party, as it has no control over the funds."   (Document 147 at 8-9) (internal footnote omitted.) The Defendants continue to argue that the Plaintiffs' reliance on the SPD is flawed because "that document specifies that the Plan Unit 155 Rules control (which document in turn is governed by the Trust Agreement)."   (Document 147 at 10; Document 145 at 10-12.)   They continue to argue that Plan Unit 155 was not a separate ERISA plan, (Document 147 at 12-13), the Greenbrier chose to leave and was not kicked out, (*id.* at 13-14), trust principles do not compel a transfer, (Document 147 at 14-16), and the extrinsic evidence supports their position and not that of the Plaintiffs.   (*Id.*

17

at 16-17.)   Further, the Defendants contend that the cases Plaintiffs cite to support a *de novo* standard on the Trustees' decision are inapposite, and stress that The Greenbrier did not give the Trustees enough time to issue a formal decision before commencing their lawsuit.   (Document 147 at 19-20; Document 145 at 17-18.)

As an initial matter, the Court finds that the Defendant's motion to strike should be denied. The Defendants concede that the "opinions" in the expert's declaration were not previously unknown.   They simply object to their inclusion in a declaration.   In other words, the Court finds that the Defendants have not suffered any surprise or undue prejudice by the inclusion of the Garofolo Declaration.   In addition, the Defendants have already deposed Mr. Garofolo.   They are aware of his opinions, and have not pointed to any opinions contained in the declaration that are new or were previously undisclosed.   Further, the Court finds the argument that the Declaration is simply intended to exceed the page limit to be unpersuasive.

*A. Article III standing*

"The requisite elements of Article III standing are familiar: 'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"   *Wilmington Shipping Co. v. New England Life Ins. Co.*, 496 F.3d 326, 334 (4th Cir. 2007) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).   Here, there can be no doubt that both the Greenbrier and the specific employee-participants have alleged an injury in fact because they argue that the Defendant Trustees breached their fiduciary duties by (improperly) amending the Plan documents to retain the disputed excess assets.   Further, the Plaintiffs blame the Trustees of the Fund for the untimely demise of Plan Unit 155 and ensuing failure to transfer the remaining excess assets via decisions made in their fiduciary capacity,

18

evincing a causal connection between the Defendants' actions and Plaintiffs' alleged injury. Finally, redressability is satisfied because it is likely, as opposed to speculative, that a favorable decision by this Court will recompense Plaintiffs for their injury.   However, standing under Article III is the first prong.   The Court must also address standing under ERISA and its unique statutory framework.

*B. ERISA standing*

"Congress enacted ERISA to protect 'the interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.'"   *Tatum v. RJR Pension Inv. Committee*, 761 F.3d 346, 355 (4th Cir. 2014) (quoting 29 U.S.C. § 1001(b)).   "ERISA §502(a)(2) provides that '[a] civil action may be brought—by the Secretary [of Labor], or by a [plan] participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.'"   *Wilmington*, 496 F.3d at 338 (quoting 29 U.S.C. 1132(a)(2)).   As discussed above, the Defendants concede that the Greenbrier's employees, as plan participants, enjoy standing under the plain language of ERISA.[3]   However, they challenge the notion that the Greenbrier itself has standing as a fiduciary.   Their arguments are misplaced.

"Under ERISA, a person 'is a fiduciary with respect to [an ERISA] plan to the extent . . . [that] he exercises any discretionary authority or discretionary control respecting management of [the] plan [or] has any discretionary authority or discretionary responsibility in the administration

---

3   The Court notes that the Defendants also argue that all Plaintiffs—Participants and the Greenbrier—ceased to have standing when Plan Unit 155 was terminated and because they were no longer making requests for benefits. These contentions are discussed below.

of [the] plan.'"   *Sonoco Products Co.*, 338 F.3d at 373, n 11 (quoting 29 U.S.C. 1002(21)(A)).

"A plan sponsor, however, only possesses standing to pursue actions under § 502(a) that are 'related to the fiduciary responsibilities it possesses.'"   *Id.* (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457. 1465 (4th Cir. 1996)).   "Fiduciary duty under ERISA is not an all-or-nothing concept," *Marks Construction Co., Inc., v. Huntington Nat. Bank*, 614 F.Supp.2d 700, 713 (N.D.W. Va. 2009) (Stamp, J.) (citing *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 61(4th Cir. 1992)), and "a party is a fiduciary only as to the activities which bring the person within the definition."   969 F.2d at 61.   In turn, "[t]he discretionary authority or responsibility which is pivotal to the statutory definition of 'fiduciary' is allocated by the plan documents themselves." *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).

After review of all of the plan documents and the parties' briefings, the Court concludes that the Greenbrier has presented evidence that it is a fiduciary because it (i) exercised fiduciary control over plan assets—contributions—before they were remitted to the Fund, (ii) regularly audited employment rolls to ensure that correct amounts of contributions were being remitted and that only participants and their beneficiaries were receiving benefits from the Fund, and (iii) had a continuing duty to monitor the Trustees of the Fund once it became a party to the Trust Agreement. Although this evidence would not automatically result in fiduciary status for the Greenbrier for *all* aspects of Plan Unit 155, it is enough to bestow fiduciary status on the Greenbrier because the Greenbrier is suing the Trustee-Defendants in relation to its (and their) responsibilities to ensure adequate funding for the Plan, and the Greenbrier's employees, themselves participants in the Fund, were remitting appropriate contributions.

ERISA "does not limit fiduciary status to the fiduciaries named in a plan document," but instead "provides that a person or entity is a 'functional fiduciary' to the extent that he, she, or it 'exercises *any* discretionary authority or discretionary control respecting management . . . or disposition of [the Plan's] assets.'" *Tatum*, 716 F.3d at 357, n. 6 (quoting 29 U.S.C. § 1002(21)(A)(emphasis and brackets in original). The evidence here, taken from the Plan documents, establishes that the Greenbrier possessed oversight responsibility with respect to contribution levels and auditing, and appointment and removal power of Employer Trustees, and these directly relate to the instant dispute and allegations that the Trustees breached fiduciary duties to the Participants and the Greenbrier. *See Coyne*, 98 F.3d at 1465. Thus, here it can be said that the Greenbrier seeks to "enforce the rights of the Plan Beneficiaries," and even if this suit is related to harm it suffered, the harm is not entirely "independent from any harm suffered by the Plan Beneficiaries." *Sonoco*, 338 F.3d at 374.

Additionally, the fact that Plan Unit 155 is now terminated does not change this. As the Fourth Circuit made clear in *Wilmington*, ERISA "does not say that a plan participant [or fiduciary] can sue for breach of fiduciary duty 'until plan termination' or 'before plan termination,' just that a participant [or fiduciary] can sue for breach of fiduciary duty." 496 F.3d at 338. Importantly, "there is no provision in the statutory scheme that expressly revokes participants' standing upon termination of the plan. *See United States v. Morton*, 467 U.S. 822, 828 (1984)." *Id*.

Moreover, this result is all the more appropriate because the Plaintiffs argue that the very decision to terminate Plan Unit 155, after amending certain Plan documents to retain excess assets, was a breach of the Trustees' fiduciary duties. "Pursuant to the duty of loyalty, an ERISA fiduciary must 'discharge his duties . . . solely in the interest of the participants and beneficiaries.'"

21

*Tatum*, 761 F.3d at 356 (quoting 29 U.S.C. § 1104(a)(1)). It would be circular analysis to declare the result of an alleged breach of fiduciary duty to be the very mechanism that forecloses the standing of parties attempting to hold the fiduciary responsible. ERISA promises "ready access to the Federal courts" through "appropriate remedies [and] sanctions." 29 U.S.C. §1001(b). The Plaintiff participants and the Greenbrier enjoy standing under both Article III and ERISA.

### C. Remaining Issues

The remaining issues of whether the decision(s) of the Trustees to (i) amend Plan documents and (ii) not remit excess assets breached fiduciary duties, and whether Plan Unit 155 is an existing benefit schedule, all involve genuine disputes of material fact(s) that foreclose a grant of summary judgment.

Employing all reasonable inferences, and viewing the evidence in the light most favorable to the non-moving party for each set of briefs, the Court finds that there remains a genuine dispute of material fact as to whether the Trustee-Defendants breached their fiduciary duties by amending the plan documents to purportedly bolster their (subsequent) position of denying a transfer of the excess assets. In the light most favorable to the Plaintiffs, the facts and inferences therefrom indicate that the Defendants amended certain plan documents before making the decision not to transfer excess assets.

The Defendants have presented argument and evidence that the Court should employ an abuse of discretion standard because the actions involved a discretionary choice provided for in the plan documents and any choice in that spectrum would be upheld so long as not arbitrary and capricious. The Plaintiffs have presented argument and evidence to support the conclusion that *de novo* review is more appropriate in this instance because the facts indicate that the Defendants

did not make a (timely) determination regarding the excess assets, for the Plaintiffs' review, before they filed suit.  It appears that resolution of certain relevant facts is needed to determine this Court's standard of review.  Even if one assumes that a deferential standard of review is employed, there remain genuine disputes whether the Defendants actions were in line with the Fourth Circuit's "eight factor analytical framework for assessing whether plan administrators had abused their discretion" found in *Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000).  *Kane v. UPS Pension Plan Bd. Of Trustees*, 2013 WL 6502874, * 4 (D.Md. Dec. 11, 2013) (unreported).  By way of example only, the parties dispute the language of the plan documents and whether the fiduciary's interpretation was consistent with other provisions of the plan and with earlier interpretations of the plan, as well as the fiduciary's motives and any conflict of interest(s).[4]  Thus, again, summary judgment is inappropriate.

With respect to whether Plan Unit 155 was a separate ERISA plan or instead a subpart of the Fund, the Court also finds summary judgment inappropriate at this phase.  Although the Defendants argue that Plan Unit 155 contributions were immediately commingled with the Fund's overall reserve pool and thus are not distinct, they also assert in their pleadings that the Fund was able to determine which years the benefits paid exceeded the contributions of the Greenbrier and Participants.  In other words, it was known whether Plan Unit 155 contributions were enough to cover Plan Unit 155 benefits paid for any given year.  Additionally, there has been evidence

---

4    The Court notes that the *Booth* factors are usually employed when reviewing "the reasonableness of a fiduciary's discretionary decision," and even then, a court is not limited to these eight factors.  *Booth*, 201 F.3d at 342.  In addition, "a court, presented with a fiduciary's conflict of interest, may lessen the deference given to the fiduciary's discretionary decision to the extent necessary to 'neutralize any untoward influence resulting from that conflict.'" *Booth*, 201 F.3d at n. 2 (internal quotations and citation omitted.)

presented that only the Greenbrier's employees comprised Plan Unit 155, and it terminated after the Greenbrier was no longer enrolled.   The Defendants have presented evidence that Plan Unit 155 never filed the necessary regulatory paperwork required of all ERISA plans, and that the Fund filed any and all necessary paperwork.   In short, there remains a genuine dispute of material fact as to whether Plan Unit 155 was a separate ERISA plan.

The Court has viewed all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party with respect to each set of motions, and concludes that summary judgment as to either party on these remaining issues is inappropriate.

## CONCLUSION

Wherefore, after careful consideration and for the reasons stated herein, the Court **ORDERS** that *Defendants' Motion for Summary Judgment* (Document 134) be **DENIED,** and that *Plaintiffs' Motion for Summary Judgment* (Document 137) be **GRANTED, to the extent it sought a finding that the Greenbrier was a fiduciary, and DENIED otherwise.**   The Court further **ORDERS** that *Defendants' Motion to Strike (or Disregard) Plaintiffs' Expert Declaration* (Document 148) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:    September 24, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

24