**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

GREENBRIER HOTEL CORPORATION, et al.,

Plaintiffs,

v.                                                    CIVIL ACTION NO.   5:13-cv-11644

UNITE HERE HEALTH, et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

On the 13th day of June, 2016, a bench trial began in the above-styled matter.  Trial concluded on the sixth day of testimony, which was held on July 8, 2016.  Having heard the evidence and reviewed the exhibits presented at trial, the Court finds that the Plaintiffs are entitled to the transfer of surplus assets in the amount of $5,503,181.00.

**BACKGROUND AND PROCEDURAL HISTORY**

The Plaintiffs in this case are the Greenbrier, a hotel and resort, and a group of its employees who participate in its health benefits plan.   The Defendants are UNITE HERE Health Fund, H.E.R.E.I.U. Welfare Fund-Plan Unit 155 (Plan 155), and the Plan Trustees (Trustees). UNITE HERE, a labor union, established a multi-employer trust, UNITE HERE Health (the Fund), pursuant to Section 302(c)(5) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5), as amended, and administered it in accordance with the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq*., as amended.   Plan 155 was established

1

in 2004 to serve Greenbrier employees, and was terminated on January 31, 2013.   The Greenbrier and its employees initiated this lawsuit on May 17, 2013, seeking excess or surplus assets from Plan 155 to be remitted to their new, self-funded, health benefits plan.

On December 19, 2013, pursuant to a *Memorandum Opinion and Order* (Document 35) ruling on a motion to dismiss filed by the Defendants, the Court dismissed all claims except those brought for breach of fiduciary duty under ERISA.   Both parties filed motions for summary judgment.   The Court issued a *Memorandum Opinion and Order* (Document 165) on September 24, 2015, holding that the Greenbrier is a fiduciary with standing to bring suit seeking to enforce the rights of its employees as plan beneficiaries.[1]   The Court found that factual disputes precluded summary judgment as to whether Plan 155 was a separate ERISA plan or whether any decision of the Trustees constituted a breach of fiduciary duty.   The matter proceeded to trial.   Following presentation of evidence, the parties submitted supplemental proposed findings of fact and conclusions of law.   (Def. Supp. Proposed Findings, Document 237; Pl. Supp. Proposed Findings, Document 238.)   The matter is now ripe for ruling.

## FINDINGS OF FACT

### A.  *Structure of Plan 155 and the Fund*

In 2004, employees of the Greenbrier were represented by a local union affiliated with UNITE HERE.   The Greenbrier and the local union negotiated with the Fund to begin

---

1 Some of the Defendants' arguments at trial suggest a misunderstanding of the Court's summary judgment ruling. The Court did not find that the Greenbrier is or was a fiduciary with respect to all aspects of the Fund's operation. Instead, the Court held that the Greenbrier "is a fiduciary because it (i) exercised fiduciary control over plan assets—contributions—before they were remitted to the Fund, (ii) regularly audited employment rolls to ensure that correct amounts of contributions were being remitted and that only participants and their beneficiaries were receiving benefits from the Fund, and (iii) had a continuing duty to monitor the Trustees of the Fund once it became a party to the Trust Agreement."   (Mem. Opinion and Order, at 20) (Document 165.)

participating in the Fund for healthcare coverage, and Plan 155 was established on February 1, 2004.   Participation and contribution rates were negotiated as part of the collective bargaining agreement between the union and employer, while the plan terms and benefits were governed by the Participation Agreement, Plan Rules and Regulations, and Summary Plan Description (collectively, Plan Documents).   Rates for participation in the Fund are set forth in the collective bargaining agreements between the local unions and employers and cannot be changed for the duration of the collective bargaining agreement, though the Fund can adjust benefits.   The Greenbrier made 80% of required contributions, while employee participants contributed the remaining 20%.

The Fund is a Taft-Hartley employee welfare benefit fund governed by ERISA.   It serves several plan units, most covering employers in specified geographic areas.   However, the Fund considers itself a single ERISA plan, has one tax identification number, and files only one Form 5500 with the IRS.   Each plan unit has its own administrative and eligibility rules and its own rate and benefit structure.   Contributions from employers and employees participating in each plan unit are all pooled into a single trust, and payments for claims are all made from those pooled assets.   However, Fund underwriters calculate expenses attributable to each plan unit, including claims and administrative expenses, to determine the net assets of individual plan units and ensure that rates equal or exceed costs for each plan unit.

In 2009 and 2010, UNITE HERE and the Service Employees International Union (SEIU) engaged in a lengthy dispute that resulted in a division of local unions.   In 2009, the Greenbrier's local union, Local 863,[2] opted to remain with its recognized bargaining agent, which was affiliated

---

2 Greenbrier employees are represented by several unions based on field of employment (e.g., plumbers, electricians), the largest of which is Local 863.   The unions bargain as a council, and the parties referred to Local 863 throughout

with Worker's United and SEIU, and was therefore no longer affiliated with UNITE HERE.   The Fund informed Greenbrier employees that they could not continue to participate in the Fund after the expiration of the Participation Agreement on January 31, 2013, as a result of their affiliation with SEIU rather than with UNITE HERE.

### B.   Plan Documents

Plan 155 was a separate plan unit, with its own governing documents.   While other plan units within the Fund included multiple employers, Plan 155 was formed specifically and exclusively for the Greenbrier, though it sometimes included a small number of individuals affiliated with, but not employed directly by, the Greenbrier.[3]   The Participation Agreement specified:   "The Greenbrier will be underwritten as an independent plan unit with the Welfare Fund.   Only the claims utilization of The Greenbrier Plan, including Local 863, will be used in calculating future rates for The Greenbrier."   (Participation Agreement at 6, Pl. Ex. 3.)

The Plan Rules and Regulations, adopted in 2004, provided that:

> If it should happen that the Plan is terminated, benefits for a Covered Expense incurred before the termination date fixed by the Trustees will be paid as long as the Plan's assets are more than the Plan's liabilities.   Full benefits may not be paid if the Plan's liabilities are more than its assets.   If there are any excess assets remaining after the payment of all Plan liabilities, those excess assets will be used for purposes consistent with the purpose of the Plan as determined by the Trustees, or they may be transferred to another employee benefit fund providing similar benefits.

(Article 19, Section 12, 2004 Rules and Regulations, Pl. Ex. 1.)   The Plan Rules include a section entitled "Purpose," which provides that:

---

testimony to refer to the Greenbrier unions collectively.   For ease of reference, the Court has done the same.
3  The example given during trial was that of Connie Vance, a Greenbrier employee who took a leave of absence to work as a local office manager for the Fund.

4

> These Rules and Regulations are adopted by the Trustees of the
> Hotel Employees and Restaurant Employees International Union
> Welfare Fund under the terms of the Agreement and Declaration of
> Trust in order to establish provisions which determine the Eligibility
> of Employees for the benefits provided by the Hotel Employees and
> Restaurant Employees International Union Welfare Fund and to
> prescribe the amount, extent, conditions, and methods of payment
> under the Plan of benefits for Plan Unit 155.

(Article 1, 2004 Rules and Regulations, Pl. Ex. 1.)

The 2004 Summary Plan Description likewise provides that:

> If the Plan is terminated, benefits for claims incurred before the
> termination date will be paid based on available assets.   Full
> benefits may not be available if the Plan owes more than it has
> money to pay.   If there is money left over, the Trustees may use it
> in a manner consistent with the purposes for which the plan was
> created or they may transfer it to another fund providing similar
> benefits.

(2004 Summary Plan Description at 68, Pl. Ex. 2.)   That language was unchanged in the 2009

Summary Plan Description.   (2009 Summary Plan Description at 68, Pl. Ex. 20.)

Fund attorney and 30(b)(6) witness Andrea Flaherty testified that "plan" as used in Article

19, Section 12, referred to the Fund as a whole, not specifically to Plan Unit 155.   (A. Flaherty,

Tr. Vol. 1 at 48::2-4.)   However, she admitted that the 2004 Rules define "Plan of Benefits or

Plan" as "The plan, program, method, and procedure adopted by the Trustees for Eligible

Employees and covered Dependents *of Plan Unit 155* for the payment of medical and hospital

care, dental benefits, disability loss of time benefits, or other health and welfare benefits from the

Welfare Fund…."   (2004 Rules and Regulations, Article 2, Section 36, Pl. Ex. 1) (emphasis

added.)   The 2004 Rules further define "Welfare Fund or Fund" as "[t]he Hotel Employees and

Restaurant Employees International Union Welfare Fund formulated and created under the

Agreement and Declaration of Trust and any amendments thereto, and any trust fund established

5

for similar purposes, which merges with, and transfers its assets to, the Welfare Fund."  (2004 Rules and Regulations, Article 2, Section 48, Pl. Ex. 1.)   The Trust Agreement contains a similar definition of Welfare Fund, and defines Welfare Plan as follows:

> the benefit programs established and maintained by the Trustees for the payment of medical, hospital care, dental, compensation for illness or injury, life insurance, disability and sickness benefits, death benefits and other health and welfare benefits from the Welfare Funds consistent with the purposes set forth in Sections 302(c)(5) of the LMRA.   The Welfare Plan is an 'employee welfare benefit plan' as defined in ERISA Section 3(1) and shall be administered in accordance with said statute, the Trust Agreement, and amendments thereto, and the applicable Plan Documents which contain the rules and regulations relating to eligibility for and the amount and nature of benefits that are adopted by the Trustees. Any and all amendments to said Plan Documents shall be adopted by the Trustees consistent with ERISA and the procedures set forth herein.

(Sixth Am. Trust Agreement, § 1.07, Pl. Ex. 4.)

The Sixth Amended Trust Agreement, adopted in March, 2003, states that "[t]he Trustees and the Fund Executives, as fiduciaries of the Fund, shall be fiduciaries at all times and for all activities, including when carrying out traditional settlor functions."   (Sixth Am. Trust. Agreement, Article 3, Pl. Ex. 4.)   The Seventh Amended Trust Agreement, adopted in October, 2012, removed that language.   Ms. Flaherty claimed that the change was unrelated to concerns that the Greenbrier and its employees would seek Plan 155's surplus assets.   (A. Flaherty, Tr. Vol. I. at 70::14-18.)   The Seventh Amended Trust Agreement (like the previous version) describes the purpose of the fund as follows: "to provide medical, hospital care, dental, compensation for illness or injury, life insurance, disability and sickness benefits, death benefits, and/or other health and welfare benefits as described in Section 302(c) of the [Labor Management Relations Act) for plan participants and their beneficiaries."   (Seventh Am. Trust Agreement, Article 3, Pl. Ex. 5.)

6

The Seventh Amended Trust Agreement further states:

> Subject to the stated purposes of the Fund and the provisions of this Trust Agreement, the Trustees shall have full and exclusive jurisdiction and discretionary authority to decide all questions or controversies of whatever character arising in any manner between any parties or persons in connection with the Fund or the interpretation thereof, including the construction of the language of this Trust Agreement, the benefit programs, the rules and regulations adopted by the Trustees, and any writing, decision, benefit eligibility determination, instrument, or accounts in connection with same and with the operation of the Fund or otherwise.

(Article 6, § 9, Seventh Am. Trust Agreement, Pl. Ex. 5.)

Article 14 of the Trust Agreement is entitled "Non-Alienation" and prohibits the transfer of Fund assets to participants or beneficiaries.  It further provides that "No portion of the Fund shall ever revert to or inure to the benefit of any Employer or Union, or to be used for or diverted to purposes other than for the exclusive benefit of Participants or their Beneficiaries, except as permitted by ERISA."  (Article 14, § 2, Seventh Am. Trust Agreement, Pl. Ex. 5.)  Article 15, Section 2 provides that "no amendment of this Trust Agreement shall cause any part of the Fund to be used for, or diverted to, purposes other than for the purposes of this Fund." (Article 15, § 2, Seventh Am. Trust Agreement, Pl. Ex. 5.)[4]

In 2009, following the split between UNITE HERE and SEIU, the Trustees amended the Trust Agreement to add the following language:

> Notwithstanding anything in this Trust Agreement to the contrary, if any local Union or other subordinate body of the International Union purports to secede or disaffiliate from the International Union, regardless of whether such secession or disaffiliation actually becomes legally effective, the Trustees shall, upon a recommendation by the Union caucus, be entitled to: (a) refuse to accept the continued participation of any employer with a collective

---

4 These provisions are substantially the same in the Sixth Amended Trust Agreement.

7

> bargaining agreement with such local Union or subordinate body;
> (b) terminate the participation of those employees represented by
> such local Union or subordinate body; and (c) terminate the
> participation of the employees and officers of such local Union or
> subordinate body and any applicable participation agreement.   The
> termination shall be effective on the first day following expiration
> of the then existing collective bargaining agreement which provides
> for participation in the Welfare Fund, or such earlier time as the
> Trustees determine is appropriate and legally enforceable.

(Resolution No. 5, Pl. Ex. 13.)   According to the meeting minutes, this amendment was prompted

by Trustee John Wilhelm's unhappiness with the Greenbrier's decision to be affiliated with SEIU

rather than continuing to be affiliated with UNITE HERE.   (July 27, 2009 Meeting Minutes, re:

Resolution No. 5, Pl. Ex. 13.)   Mr. Wilhelm was president of UNITE HERE from 1998 until 2012,

and a Trustee of the Fund until 2015.

A rules change for Plan 155 was enacted by mail ballot in December, 2012, to clarify that

there was no run-out[5] for claims and to terminate Plan 155, effective February 1, 2013.   The

resolution had an effective date of December 1, 2012, although it was not signed by the Trustees

and ratified until several days later.   The resolution also changed Article 19, Section 11, of the

Plan Rules and Regulations, regarding plan termination, to state:

> If it should happen that the Plan is terminated, the Fund or the
> Contracted Claims Administrator, as the case may be, shall not
> process or pay any claim for benefits filed on or after the termination
> date fixed by the Trustees.   Claims filed before such termination
> date will be processed and benefits, if any, will be paid to the extent
> that the Plan's assets exceed the Plan's liabilities; full benefits may
> not be paid if the Plan's liabilities exceed its assets.   If there are any
> excess assets remaining after the payment of all Plan liabilities,
> those excess assets will be used for purposes consistent with the
> purposes of the Trust Agreement as determined by the Trustees,

---

5 Run-out refers to the payment of claims incurred, but not paid, prior to the termination of the Plan.   Because of the
Greenbrier's financial position at the time it joined the Fund, it negotiated for the payment of "run-in" claims, that is,
claims incurred but not paid before the creation of Plan 155, rather than run-out claims.

including the transfer of such excess assets to another Plan providing
similar benefits.

(Amendment No. 3, at 1–2; Pl. Ex. 9.)   In short, Amendment Three specified that excess assets
would be used for purposes consistent with the Trust Agreement, rather than for purposes
consistent with the Plan.   Plan 155 participants were not notified of the change, and the
corresponding language in the Summary Plan Description was not altered.

### C. The Greenbrier's Participation in the Fund

The Greenbrier was owned by CSX Hotels until it went through a bankruptcy in 2009 and
was purchased by the Justice Family Group.   The Greenbrier joined the Fund in 2004 in an effort
to control healthcare costs.   The former CEO of the Greenbrier, Ted Kleisner, was involved in the
2003-2004 negotiations regarding joining the Fund.   He testified that participation in the Fund
was conditioned upon the Greenbrier having an independent plan with separate accounting and
underwriting.   (T. Kleisner, Tr. Vol. 2, at 329-30.)   The Greenbrier's CFO at the time, Larry
Mazzey, likewise understood that Plan 155 was a separate and independent plan.   He questioned
Kevin Gittens, the Fund's CFO, about the reserve requirement as applied to the Greenbrier, and
was told that the Greenbrier's reserve contributions "would be used in emergency cases for the
Greenbrier and the Greenbrier only."   (L. Mazzey, Tr. Vol. 2, at 383::18-20.)   Each Greenbrier
representative involved in the initial negotiations—including both those who left with the change
in ownership and those who remained—testified, in essence, that the negotiations had been for an
independent plan with assets not to be used for other Fund participants.

Mr. Gittens recalled the Greenbrier's emphasis on having an independent plan, and testified
that the Greenbrier was underwritten as an independent plan unit for purposes of evaluating costs
and setting rates.   However, he stated that he would not have told anyone that reserves or surplus

9

assets belonged to any individual plan unit, and had told "anyone who asked" throughout the Greenbrier's participation in the Fund that surplus assets belonged to the Fund.[6]   (K. Gittens, Tr. Vol. 4, at 736:9.)   Mr. Gittens helped prepare a Q&A document to answer questions that arose during the initial negotiations.   The document indicates that, while plans must be self-supporting, "there is no carryover of deficits to future annual accountings."   (Open Issues, 2, Def. Ex. 9.)   In response to a question asking, "What if claims fall substantially below 'premium target'?" the document states that "If the cost of the plan is substantially less than any year's contribution rate projection the surplus is the surplus of the Fund and Fund participants."   (*Id.*)

The Fund and the Greenbrier agreed to a number of unique provisions to facilitate the Greenbrier's participation.   Plan 155 was the only plan unit with only one employer, and the payment of "run-in" claims rather than run-out claims was unusual.   In addition, a dental plan was set up as a separate account to pay benefits, with no rates and no risk. The Fund simply paid benefits from the Greenbrier's dental account.   When the Greenbrier stopped funding the dental account, the surplus was used to continue to pay claims until the money was gone.   The Fund also agreed to allow the Greenbrier to pay lower contributions the first year, with a cap rate that could be charged at the end of the year if costs exceeded contributions.   Plan 155 had a deficit of about $1 million the first year, and the Fund recouped about half of that by charging the cap rate at the end of the year.   Plan 155 operated at a surplus in subsequent years, and had accumulated a surplus of $3,353,693 by January 31, 2008.   (K. Gittens Email, October 2, 2008, Pl. Ex. 29.)

---

6 Mr. Gittens claimed at one point to recall specific conversations in which Greenbrier representatives asked about surplus assets and he informed them that surplus assets would always remain the property of the Fund, but continued to give vague responses to questioning about details of those conversations.   He also admitted that he did not know of a plan being terminated prior to the Greenbrier and had not examined the provisions of plan documents dealing with termination.   (K. Gittens, Tr. Vol. 4 at 738.)   The Court has considered this in determining the credit and weight to give to his recollection of specific conversations.

That surplus, combined with the Greenbrier's financial difficulties in 2008 and 2009, prompted the Greenbrier's representatives to repeatedly raise concerns and ask questions about the surplus assets during bargaining for the 2009-2013 participation agreement.   Responses from Fund representatives continued to be mixed.   Scott Richmond, a Greenbrier accountant, recalled that, during the 2008-2009 bargaining negotiations, the Fund took the position that the Greenbrier would not be entitled to any portion of the reserves if it left the Fund.   Peter Bostic, the Greenbrier's union representative and a Fund Trustee from 2004 through 2010, reported that Mr. Gittens informed him that excess assets would remain with the Fund if the Greenbrier chose to withdraw, but indicated that the Plan language would require excess assets to be used to provide benefits for Greenbrier employees if Plan 155 were terminated.   (P. Bostic, Tr. Vol. 2, at 246.) Though Mr. Gittens did not believe he would have said excess assets could be returned to a departing employer, the Court found Mr. Bostic's testimony more credible, based on the specificity of his recollection and the demeanor of both witnesses.

Ultimately, the Greenbrier, its unions, and the Fund reached an agreement for the Greenbrier's continued participation through January 31, 2013.   John Wilhelm, the then-President of UNITE HERE and a Trustee of the Fund, testified that the Greenbrier was going through a bankruptcy and collective bargaining at the same time as UNITE HERE and SEIU were negotiating a split, and so "even though [Local 863] had said they wanted to leave our union, I acquiesced in them negotiating in the 2009 Collective Bargaining Agreement [and] continuing in our health fund."   (J. Wilhelm, Tr. Vol. 3 at 670::16-19.)   The collective bargaining agreement set maximum rates, and the Trustees could not increase the rates during the term of the agreement. Trustees could, however, adjust benefits if the status reports prepared by Mr. Gittens, or his

11

successor, Robert Simon, indicated that contributions were not keeping pace with claims and expenses.

### D.  The Termination of Plan 155

The Fund made and communicated the decision to terminate Plan 155 in 2009 or 2010. Mr. Bostic reported that then Chairman Wilhelm had been angry that Local 863 chose to affiliate with SEIU, and stated during a union caucus meeting that he planned to have the Greenbrier thrown out of the Fund.   (P. Bostic, Tr. Vol. 2, at 248.)   Mr. Bostic raised concerns about the propriety of terminating the Greenbrier, and was subsequently removed as a Fund Trustee.   At some point in 2012, the Fund offered the Greenbrier a six-month extension of its existing Participation Agreement, but the Fund did not consider allowing the Greenbrier to remain on an indefinite basis, though both union and management personnel from the Greenbrier indicated that it would have remained with the Fund if permitted.   The Greenbrier began searching for other coverage, and ultimately chose a self-insured plan.   Claims are currently paid out of the Greenbrier's general operating account, but the Greenbrier formed the New Greenbrier Trust to receive the excess assets from Plan 155 and pay qualifying health claims.

In 2012, the Greenbrier and the Fund began taking steps regarding the termination of Plan 155.   In a March 16, 2012 meeting of the Welfare Board, the Trustees delegated authority to the Chief Executive Officer "to take any action necessary to enforce the provisions of the Trust Agreement in connection with the participation of The Greenbrier and its participants and the termination of that participation."   (3/16/2012 Meeting Minutes, at 3, Def. Ex. 25.)   In June or July, 2012, Connie Vance[7] spoke with Fund Counsel Dharma Patel about both claims run-out and

---

7 Ms. Vance was a Greenbrier employee who took a leave of absence to manage the Fund's local office for Plan 155. She was officially an employee of the Fund until Plan 155 was terminated.

the potential return of excess assets.   Ms. Vance was concerned that the Greenbrier's management would not be properly informed about any agreements made prior to the change in ownership. Ms. Patel first said that the Greenbrier was not entitled to the return of any surplus assets.   Ms. Vance explained to Ms. Patel that she believed, based on her participation in the initial negotiations for the Greenbrier to join the Fund, that the Greenbrier would get any surplus back because of its independence from other Fund participants.   (C. Vance, Tr. Vol. 4, at 786.)   Later, Ms. Patel discussed changing the Plan Documents "[s]o that [the Fund] could keep the reserve money."   (C. Vance, Tr. Vol. 4, at 787.)[8]   Ms. Vance communicated the Fund's position to the Greenbrier, including CFO Terry Miller.

The Trustees adopted the Seventh Amended Trust Agreement in October, 2012, removing the provision stating that they were fiduciaries at all times and for all activities.   Mr. Bostic wrote to the Fund in late 2012, seeking information related to excess assets.   On November 30, 2012, Mr. Miller sent a letter to Ms. Patel and the Trustees, seeking additional Plan documents and an accounting of contributions and excess assets.   (11/30/2012 T. Miller Letter, Def. Ex. 5.)   On December 10, 2012, Ms. Patel provided the Seventh Amended Trust Agreement and wrote: "The amount of excess assets over liabilities in any particular plan unit is information that is not shared with contributing employers.   The Trustees retain exclusive authority on use of any excess assets. Further, the Fund does not know if there will be any excess assets at the time of termination." (12/10/2012 D. Patel Letter, Pl. Ex. 18.)   In early December, 2012, the Trustees adopted

---

8 The Defendants objected to Ms. Vance's testimony regarding her conversations with Ms. Patel on the basis of attorney-client privilege.   The Court finds the testimony admissible, as the conversations in question were intended to facilitate communication of the Fund's position to the Greenbrier, and did not include confidential attorney advice. However, the content of the conversations is not necessary to the Court's ruling.   Ms. Vance's conversations with Ms. Patel add names and approximate dates to a pattern of events that can be readily inferred from the Fund's actions: The Fund expressed its intention to keep the Plan 155 surplus, and amended the Plan documents when someone realized that those documents could require that the surplus be returned to the Greenbrier.

Amendment 3 to the Plan Rules and Regulations by mail ballot, changing the language of the termination provision, which previously required excess assets to be used for purposes consistent with the Plan, to state that excess assets "will be used for purposes consistent with the purposes of the Trust Agreement as determined by the Trustees."   (Amendment No. 3, at 1–2; Pl. Ex. 9.)

The Fund ceased paying claims for Greenbrier employees on February 1, 2013.   On May 10, 2013, the Greenbrier sent a letter to the Fund, demanding the transfer of surplus assets. (5/10/2014 T. Miller Letter, Pl. Ex. 14.)   Therein, the Greenbrier indicated that it was "establishing a tax qualified trust in accordance with ERISA and the IRC…to pay all or a portion of the cost of the benefits of the employees in the same bargaining units as covered by Plan 155." (*Id.*)   The Fund did not respond prior to the Plaintiffs initiating this suit on May 17, 2013, though Ms. Flaherty testified that the Fund's CEO directed that the demand be denied.   No such denial letter was drafted or sent.   The Fund responded to the demand only through this litigation, and the Trustees met to discuss the demand only after this suit had been filed.

Both parties presented experts to testify on the appropriate response from a fiduciary under the circumstances presented by this case.   Joseph Garofolo, an attorney with significant ERISA and fiduciary experience, testified for the Plaintiffs, and Jani Rachelson, an attorney with an extensive ERISA practice, testified for the Defendants.[9]   Gerald Crews, an underwriter with ERISA experience, also testified for the Defendants.   Mr. Garofolo opined that the Plan documents, read together, unambiguously required the transfer of surplus assets to the participants of Plan 155.   Even if the language were ambiguous, Mr. Garofolo testified there was a fiduciary

---

9 The Court found Mr. Garofolo's testimony particularly helpful.   The expert testimony in this case involved mixed questions of fact and law, and Mr. Garofolo struck an appropriate balance by offering testimony regarding how a fiduciary should evaluate the request and the available information without delving directly into legal questions that the Court must resolve.

obligation to transfer the assets based on the purposes of the plan, ERISA requirements, the contributory nature of the plan, and the potential conflict of interest of Trustees who (a) might prefer to retain assets for the Fund and its continuing participants and (b) might wish to punish the Greenbrier's decision to disaffiliate with UNITE HERE.   (J. Garofolo, Tr. Vol. 3, at 467-81.)   He further stated that Amendment Three to the Plan Rules, as well as the refusal to transfer the surplus, were discriminatory decisions.

Ms. Rachelson opined that transferring the money would be a breach of the Trustees' fiduciary duty, because it would benefit the Greenbrier and violate the law.   Ms. Rachelson stated that there was no discrimination in this case, because individuals within Plan Unit 155 were all treated equally, and no other plan unit had received surplus assets following termination.   She believed that it was appropriate for the Trustees to override the language in the Summary Plan Description if it required transfer, based on the language of the Trust Agreement requiring funds to be used to benefit participants.   Mr. Crews likewise offered the opinion that "it would be a breach of fiduciary duty for the trust to use their assets to benefit non-participants," including former participants after termination of their plan unit.   (G. Crews, Tr. Vol. 5, at 1087::7-11.)

### E.   Reserves and Excess Assets

Following downturns in the hospitality industry after the September 11, 2001 terrorist attacks, the Fund enacted a policy requiring maintenance of reserves equal to six months of costs. (R. Simon, Tr. Vol. 3, at 581; *see also* Bd. of Trustees Meeting, June 13, 2002, Reserve Position Resolution, Def. Ex. 14.)   Thus, the Fund attempts to set rates and benefits to ensure that contributions are sufficient to cover benefit costs, provider fees, administrative expenses, and a proportionate share of the reserves.   Mr. Simon explained that, when the Fund sets new rates, it

15

bases them on the "best estimate of future costs," without either attempting to recoup a deficit or applying any surplus to reduce future rates.   (*Id.* at 582-585.)   Any surplus becomes part of the reserves.   Two of the Plaintiffs' experts, accountant Dan Selby and Mr. Garofolo, pointed out that there is no need for a reserve associated with the potential liabilities of Plan 155 and its participants after the termination of the Plan.   (D. Selby, Tr. Vol. 5 at 954; J. Garofolo, Tr. Vol. 6, at 1180.) Mr. Simon agreed that "if the number of people declines and our reserve dollar amount stays the same, then it becomes a larger reserve position," such that the removal of the Greenbrier employees and dependents from the Fund improved the reserve position for remaining participants.   (R. Simon, Tr. Vol. 3, at 615-17.)

The Fund refused to perform a detailed accounting and has not done so to date.   However, the Fund did maintain detailed records reflecting the performance of all plan units, including Plan 155, each year.   Those records include total contributions, total claims, and administrative expenses.   Greenbrier accountant Scott Richmond and Mr. Selby calculated a total surplus of $5,503,181, as of January 31, 2013.   Mr. Simon agreed that the numbers for Plan 155 result in an overall surplus of about $5.5 million, but stated that money could not be considered excess assets, because the Fund's goal is to maintain a reserve, requiring plans to maintain a surplus over time. Further, he said that the $5.5 million includes "investment income and other income," and, after removing $2.3 million for investment returns and $4.5 million for the reserve requirement, Plan 155 was not self-supporting.   (R. Simon, Tr. Vol. 3, at 595::4-6, 598-99.)   Ultimately, however, Mr. Simon testified that he believed there was a surplus of about $4.3 million attributable to the Greenbrier.   He did not provide records or detailed testimony explaining how he reached that number.   Based on the testimony and the documentation, the Court finds that the Greenbrier's

contributions exceeded expenses by $5,503,181 at the time Plan 155 was terminated.

## CONCLUSIONS OF LAW

The Plaintiffs argue that the Plan documents mandate that the surplus be used for the benefit of Plan 155 participants.   As the Fund terminated Plan 155, the surplus must therefore be transferred to the new plan now serving the Greenbrier employees.   The Plaintiffs assert that the Fund's denial of their demand for the surplus assets is not entitled to deference because (a) it involved a breach of fiduciary duty and (b) the Trustees did not exercise any discretion they may have had because they did not communicate their decision or any analysis, beyond litigation positions.   Whether given de novo or deferential review, however, the Plaintiffs argue that Plan 155 contributions must be used or transferred for the benefit of Plan 155 participants, based on the Plan language and the relevant factors for evaluation of abuse of discretion.   To the extent the amendment of the Plan Rules would counsel a different result, the Plaintiffs argue that the amendment constituted a breach of fiduciary duty, was unreasonable, and was made without proper notice, and therefore should not be given effect.

The Defendants assert that the Plaintiffs ceased to be participants, or, in the case of the Greenbrier, a fiduciary, on January 31, 2013, and therefore lack standing to sue.   They argue that any transfer of assets would violate ERISA's anti-inurement provisions because it would ultimately benefit the Greenbrier by displacing money it would otherwise spend to provide health benefits.   They further argue that it would be a breach of the Trustees' fiduciary duties to transfer funds to the Greenbrier employees, who are no longer participants in the Fund, rather than using the money to benefit remaining participants.   The Defendants assert that amending plan documents is not a fiduciary function, and the amendments made were not an abuse of discretion.

17

Therefore, the Plan Rules are effective and must be interpreted as amended.   They argue that the Trust Agreement precludes transfer, and any contradictory language in other Plan documents should be disregarded.   Further, in the Defendants' view, all assets are Fund assets rather than Plan assets, and therefore there are no excess assets to transfer.   The Defendants argue that the language in the Summary Plan Description stating that "[i]f the Plan is terminated," excess assets are to be used "in a manner consistent with the purposes for which the plan was created" refers to the termination of the Fund as a whole.   In sum, the Defendants argue, the Trustees acted reasonably and did not abuse their discretion by denying the Plaintiffs' request for excess assets.

### A.  Anti-inurement

With certain exceptions, ERISA mandates that "the assets of a plan shall never inure to the benefit of any employer."   29 U.S.C. § 1103(c)(1).   The Supreme Court has explained that "[t]he purpose of the anti-inurement provision, in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others."   *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004) (holding that a working owner could participate, with other employees, in an ERISA plan).

The Court finds that ERISA's anti-inurement provision does not bar the Greenbrier's request to transfer excess assets from Plan 155 to a trust that will provide health benefits to the same unionized employees who participated in Plan 155.   While the excess assets would reduce the Greenbrier's (and its employees') spending on provision of health benefits through its self-insured plan, the essential issue is whether the money is used to provide benefits.   There is no question in this instance that the money—contributions made directly by Greenbrier employees

18

and by the Greenbrier as part of employees' compensation packages—would be used to provide health benefits.   Further, if the money remains in the Fund, it would ultimately reduce the contributions that other participants and their employers must make.   Transferring the assets to apply to the Greenbrier employees' health plan no more inures to the benefit of the Greenbrier than leaving the assets in the fund inures to the benefit of the other participating employers.   The transfer of funds to pay health benefits for the employees on whose behalf those funds were contributed does not violate 29. U.S.C. § 1103(c)(1).

### B.  Status as Participants

The Defendants devoted a great deal of time arguing that the Greenbrier employees ceased to be "participants" in Plan 155 when it terminated on January 31, 2013.   Because the issues in this matter involve what happens upon plan termination, the Court finds the discussion about participation status to be irrelevant.   Claims regarding plan terms, duties, and benefits applicable upon plan termination must necessarily be pursued by former participants.   Under the Defendants' theory, there would be no remedy for the breach of plan terms or fiduciary duties owed to departing participants.   The Court declines the opportunity to adopt such a theory.

### C.  Plan Documents

Standard rules of contract interpretation are applicable to ERISA plans.   *See, e.g.*, *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013); *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir.1996).   "A paramount principle of contract law requires us to enforce the terms of an ERISA insurance plan according to the plan's plain language in its ordinary sense, that is, according to the literal and natural meaning of the Plan's language."   *Johnson*, 716 F.3d at 819–20 (internal punctuation and citations omitted).   Courts are to focus on "'what a reasonable person

in the position of the participant would have understood those terms to mean.'" *Id.* (*citing LaAsmar v. Phelps Dodge Corp. Life Acc. Death & Dismem. & Dep. Life Ins. Plan,* 605 F.3d 789, 801 (10th Cir.2010)).

The Summary Plan Description, which is the only plan document shared with participants, and the 2004 Plan Rules and Regulations each contain similar provisions regarding plan termination.[10]   Those provisions state that excess assets may be used in a manner consistent with the purpose of the Plan or may be transferred to another fund providing similar benefits.   The Plan Rules include a section setting forth their purpose as "to prescribe the amount, extent, conditions, and methods of payment under the Plan of Benefits for Plan Unit 155."   (Article 1, 2004 Plan Rules and Regulations, Pl. Ex. 1.)   The parties agree that Plan Unit 155 was established to provide benefits for the employees of the Greenbrier.   As the Greenbrier and Local 863 increased their queries to the Fund regarding the transfer of excess assets in the weeks prior to the termination of Plan 155, the Trustees adopted an amendment to the termination provision of the Plan Rules and Regulations, stating that "excess assets will be used for purposes consistent with the purposes of the Trust Agreement as determined by the Trustees, including the transfer of such excess assets to another Plan providing similar benefits."   (Amendment No. 3, at 1–2; Pl. Ex. 9.)   The Trust Agreement gives the Trustees "full and exclusive jurisdiction and discretionary authority to decide all questions or controversies of whatever character arising in any manner between any parties or persons in connection with the Fund or the interpretation thereof."   (Article 6, § 9, Seventh Am. Trust Agreement, Pl. Ex. 5.)

---

10  Some witnesses for the Fund took the position that the termination section referred only to termination of the entire Fund.   However, the relevant definition sections defined "Plan" to mean the plan unit (here, Plan 155) and "Fund" to mean the entire Fund.   The Court will interpret the plan language based on the definitions contained in the relevant documents, rather than the self-serving and contradictory testimony of the Fund's witnesses.

Several interconnected issues must be resolved with respect to the plan language: whether the amendment to the Plan Rules is effective, whether either version is ambiguous, and whether any decision or interpretation by the Trustees is entitled to deference.

As recounted above, the Fund learned that the Greenbrier believed the Plan documents required that the excess assets be used for their benefit or transferred to their new plan in late summer, 2012. The Trustees removed the language stating that they would act as fiduciaries at all times in October, 2012,[11] and then proceeded to amend the termination provision of the Plan Rules in an effort to bolster the Fund's claim to the excess assets. The Court assumes, without deciding, that the Trustees were not acting as fiduciaries when they amended the Plan Rules.[12] The Plan Rules provide: "In order that the Trustees may carry out their obligation to maintain, within the limits of the funds available to them, a sound and economical program dedicated to providing the maximum benefits for Participants and covered Dependents, the Trustees expressly reserve the right in their sole discretion, at any time and without notice…but upon a non-discriminatory basis," to amend the Plan. (2009 Plan Rules and Regulations, Article 19, Section 1, Pl. Ex. 10.) "Participant" is defined as "Any Employee who is Eligible for coverage under the

---

[11] Ms. Rachelson extensively opined regarding a Department of Labor Field Assistance Bulletin that explains that "it would not be appropriate for a multiemployer plan to pay expenses attendant to activities that a multiemployer plan trustee carries out in a settlor capacity." (Dept. of Labor, Field Assistance Bulletin 2002-2, Nov. 4, 2002, accessed at https://www.dol.gov/ebsa/regs/fab2002-2.html on 8/19/2016.) The Bulletin advises that adopting language like that in the Sixth Amended Trust Agreement, stating that the Trustees act as fiduciaries at all times, enables the use of plan funds for traditional settlor functions. Ms. Rachelson believed language adopting a fiduciary role for all decisions is ineffective. However, no testimony suggested that the Defendants used any funds other than plan funds for all activities, including the amendment of the Plan Rules, and Ms. Flaherty testified that plan assets have paid for the defense of this case, presumably including the defense of the adoption of Amendment Three to the Plan Rules and Regulations.

[12] The Defendants relied upon case law outlining the settlor/fiduciary distinction. It is not clear that this amendment—made to the termination provision specific to Plan 155 after it was clear the decision had been made to terminate Plan 155—is a settlor decision. Nor is it clear that Trustees of a multi-employer health plan are "settlors" who should be treated like employers who fund and administer plans. After all, the Trustees in this case, while affiliated with individual participating unions or employers, are not the settlors of the money contained in the plan, and do not face the conflict of determining plan structure while prioritizing the resources and obligations of a business.

applicable provisions set forth in the Plan," and thus, for purposes of the Plan Rules, includes only participants in Plan 155.   (Id. at Article 2, Section 33.)

The December 2012 amendment was made for the purpose of depriving the Plan 155 participants of funds otherwise reserved for their benefit.   It was designed to favor the interests of participants in other plan units over Plan 155's participants.   As such, it was not an amendment contemplated by the Plan Rules, which permitted amendments that would serve the purposes of Plan 155 and its participants.   In short, the Court finds that the amendment was unreasonable, discriminatory, in bad faith, and made in violation of the Plan's amendment procedures.   *See, e.g.*, *Overby v. Nat'l Ass'n of Letter Carriers*, 595 F.3d 1290, 1295 (D.C. Cir. 2010) (holding that an amendment is valid only if amendment procedures were followed); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 789 (7th Cir. 1996) (explaining that employees could recover for procedural violations of notice and amendment provisions if the employer acted in bad faith to prejudice the employees); *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 125 (3d Cir. 1995) (same).

Absent the amendment, the termination provisions in the 2009 Plan Rules and the Summary Plan Description speak directly and unambiguously to the proper disposition of excess assets upon plan termination.   Those documents require that funds either be spent on benefits for Plan 155 participants or transferred to another plan for the benefit of Plan 155 participants.   No other documents contain contradictory provisions.   The Trust Agreement requires that the Fund be used for the benefit of participants and beneficiaries, except as permitted by ERISA, and bars use for "purposes other than for the purposes of this Fund."   (Article 14, § 2, Article 15 § 2, Seventh Am. Trust Agreement, Pl. Ex. 5.)   That language is not inconsistent with the more explicit and specific requirements of the Summary Plan Description and Plan Rules, which speak directly

to Plan termination.   The Defendants' attempt to read ambiguity and discretion into the termination provisions is unavailing.   The provisions permit the Trustees to use the money to provide benefits to Plan 155 participants or to transfer the money to a plan that will do so.   The discretion to choose between two stated options does not incorporate unconstrained discretion to use the excess assets for any other purpose.   This is particularly clear given that both stated options involve using the excess assets for the benefit of the Greenbrier employees, while the Defendants propose using the excess assets for the benefit of other Fund participants.

The Trustees did not alter the termination provision of the Summary Plan Description.   If the amendment to the termination provision in the Plan Rules were effective, the same outcome would result.   The amendment introduces ambiguity to the Plan Rules and grants the Trustees additional discretion, but the Court does not find that it conflicts with the termination provision of the Summary Plan Description.   Contrary to the Defendants' position, the disbursement of funds to provide benefits to the participants who made the contributions, even after their termination from the Fund, supports the purposes of the Fund.   Read in concert, therefore, the Plan documents require use of the funds in accordance with the most specific applicable provision.

As the Court finds that the Plan language unambiguously requires transfer of the funds upon termination, it clearly follows that any decision by the Trustees not to do so constitutes an abuse of discretion.   *See Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007) (abrogated on other grounds) ("To the extent the administrator enjoys discretion to interpret the terms of a plan in the course of making a benefits-eligibility determination, such interpretive discretion applies *only to ambiguities* in the plan.") (emphasis in original.)   However, the Court will also address the Trustees' decision not to transfer funds, assuming *arguendo* that

the Plan documents were ambiguous or otherwise granted the Trustees discretion.

### D.  Denial of the Greenbrier's Request for the Transfer of Funds

The United States Supreme Court has held that breach of fiduciary duty under ERISA is subject to de novo review unless the plan documents give the fiduciaries discretionary authority. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   The Trust Agreement gives the Trustees discretionary authority to construe plan language, resolve disputes, and make benefit determinations.   (Article 6, § 9, Seventh Am. Trust Agreement, Pl. Ex. 5.)   In *Booth v. Wal–Mart Stores, Inc. Associates Health & Welfare Plan,* the Fourth Circuit set forth a non-exclusive list of factors "for determining the reasonableness of a fiduciary's discretionary decision:"

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d 335, 342–43 (4th Cir. 2000); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010) (reiterating the *Booth* factors).

As an initial matter, the Court notes that even if the Trustees had discretion to make a decision regarding the Greenbrier's request for the transfer of the excess assets, the Trustees did not make and communicate such a decision prior to this litigation.   They cite the short time between the Greenbrier's formal demand for the return of excess assets and the filing of this lawsuit, but at no point during this litigation did they suggest that the suit be stayed or dismissed

to permit their consideration of the issue in the first instance.   The *Booth* factors assume the existence of a decision and analysis by the fiduciary (not attorneys hired after the fact for litigation) that courts may evaluate.   The Court cannot defer to or evaluate the reasonableness of an analysis by the Trustees that does not exist.   *Cerra v. Harvey*, 279 F. Supp. 2d 778, 782 (S. D. W.Va. 2003) (Haden, J.).

Assuming, however, that the Trustees made and communicated a decision, the *Booth* factors do not support the denial of the Greenbrier's request for return of surplus assets.   The Court has already discussed the language of the Plan; even if it were ambiguous or discretionary, the Summary Plan Description's termination provision, at the least, suggests excess assets are to be used for the benefit of the Greenbrier employees.   As the Summary Plan Description is the only document provided to participants, it is entitled to careful consideration.   Plan 155 was designed and implemented to provide health benefits to the Greenbrier's unionized employees. The Trustees should have considered that purpose, as well as the specific priorities emphasized by the Greenbrier as it negotiated participation, including the independence of Plan 155 from the other plan units in the Fund.   As discussed, the decision making process left much to be desired—from the last minute attempted amendment of the Plan Rules to the failure to provide a decision outside of litigation.   Finally, the Trustees should have given consideration to their conflict of interest in choosing to retain funds for remaining participants in other plan units rather than transferring the funds to outgoing participants.

### E.   Broader Implications

The Defendants, and their expert witnesses, suggested that a decision in favor of the Plaintiffs in this case would upend the policy and structure underlying multi-employer health

benefit plans.   The Court views this case much more narrowly.   First, the Plaintiffs' entitlement to benefits is based on unambiguous Plan language.   The Court found no general principle or case law that either requires or prohibits the transfer of assets in these circumstances.[13]   Multi-employer plans with plan language stating that all contributions remain the property of the fund upon termination of certain plan units or employers would permit the fund to retain those assets. Second, the unique structure of the Fund, and Plan 155, makes the return of excess assets practical in this case.   Not all multi-employer plans are divided into separately underwritten plan units, such that termination of a plan unit with clearly distinguishable assets could take place.   Within the Fund, only Plan 155 served a single employer.   Third, the transfer of assets to new health plans serving departing participants would have little impact on the financial stability of multi-employer health plans.   Exiting participants take their potential liabilities with them, resulting in little net change to the reserve position.   Finally, participants would be unlikely to make decisions about whether to withdraw from a health plan based on the availability of surplus assets, rather than the value provided by the plan in comparison to other options.

### F. Damages and Attorneys' Fees

As the Court found in the Facts section herein, Plan 155 had accumulated a surplus of $5,503,181 when it was terminated.   The Plaintiffs request application of West Virginia's statutory interest rate of 7%, as well as an award of attorneys' fees and costs.   The Court declines to award pre-judgment interest, and notes that the state interest rate is quite divergent from the federal rate set for post-judgment interest.

---

13 The Court has reviewed the cases cited by the Plaintiffs in which assets were returned to departing participants, most prominently, *Trapani v. Consolidated Edison Employees' Mutual Aid Soc., Inc.*, 891 F.2d 48 (1989).  *Trapani* outlines the equitable considerations in favor of transfer, but does not state a general requirement that assets remain with the employees on whose behalf they were contributed.

Under ERISA, courts have discretion to award reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(1). The Fourth Circuit has established a five-factor test "to guide the district court's exercise of discretion," as follows:

> (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993); *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 227 (4th Cir. 1998). Here, the Court has found that the Fund's actions were in bad faith. The attempt to amend the Plan Rules shortly before terminating Plan 155 was particularly egregious, and refusing to give the Plaintiffs an explanation for the denial of their claim outside of this litigation further evidences bad faith. No evidence suggests that the Fund is facing financial difficulties, and its reserve policy ensures adequate funding. The circumstances of this case are unusual, but an award of attorneys' fees should deter Trustees from engaging in such strained readings of plan language to benefit a favored group of participants. The Plaintiffs seek to benefit all participants in Plan 155, though not all participants in the Fund. Finally, the Fund's position was contrary to the Plan language and rested largely on overblown policy concerns. Therefore, the Court finds that the factors weigh in favor of an award of attorneys' fees and costs to the Plaintiffs.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, for the reasons stated herein, the Court finds that the Trustees of the UNITE HERE Health fund breached their fiduciary duties by failing to transfer the surplus assets associated with Plan 155 to the New Greenbrier Trust.   The Court **ORDERS** that judgment be entered in favor of the Plaintiffs and against UNITE HERE Health **in the amount of $5,503,181.00, and that said amount be transferred to the New Greenbrier Trust.**   The Court further **ORDERS** that the Plaintiffs' request for reasonable attorneys' fees and costs be **GRANTED**.   The Plaintiffs' calculation of applicable costs shall be filed **no later than September 9, 2016.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:        August 26, 2016

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

28